[819 NE2d 991, 786 NYS2d 375]

STATE OF NEW YORK, Respondent-Appellant, v SPEONK FUEL, INC., Appellant-Respondent, et al., Defendants.

Argued September 8, 2004; decided October 19, 2004

**APPEARANCES OF COUNSEL**

*Nicholas J. Damadeo, P.C.*, Smithtown (*Nicholas J. Damadeo* of counsel), for appellant-respondent.

*Eliot Spitzer, Attorney General*, Albany (*Edward Lindner, Caitlin J. Halligan, Daniel Smirlock* and *Patrick Barnett-Mulligan* of counsel), for respondent-appellant.

MEMORANDUM.

The order of the Appellate Division should be affirmed, without costs.

Defendant Local Wrench Service Station, Inc. immediately preceded defendant Speonk Fuel, Inc. as the owner and operator of a gasoline service station and its associated underground petroleum storage system in East Quogue, New York. On October 24, 1985, Local Wrench's storage system, which included five underground gasoline tanks, was tested for tightness. One of these five tanks—a 4,000-gallon unleaded gasoline tank—failed the tightness test. Subsequently, on January 22, 1986, the tank was removed from the ground and found to have a hole approximately one eighth of an inch in diameter, causing its abandonment. A representative of the New York State Department of Environmental Conservation witnessed the defective tank's removal. Having determined that it was not possible to clean up all the oil-contaminated soil resulting from the tank's past leakage, on January 24, 1986 DEC advised Local Wrench to install groundwater monitoring wells. DEC warned that if Local Wrench failed to investigate and remedy groundwater contamination attributable to the leak, DEC would undertake this work through contractors and seek reimbursement and penalties pursuant to article 12 of the Navigation Law, commonly called the Oil Spill Act.

At the same time as these events were unfolding, Local Wrench was negotiating to sell its gasoline service station, the associated underground petroleum storage system and the underlying real property to Speonk and its president, Thomas H. Mendenhall. On January 8, 1986—about two weeks before the defective tank was permanently removed from service— Speonk contracted to purchase the service station and the storage system, and Mendenhall contracted to purchase the real property. On March 12, 1986—roughly seven weeks after the defective tank was permanently removed—Speonk acquired title to the service station and the storage system, and Mendenhall acquired title to the real property by bargain and sale deed.

Mendenhall had visited the service station on October 24, 1985, and so observed the tank tightness testing. Moreover, he acknowledges that after the closings on March 12, 1986, his attorney and the attorney for Local Wrench's owner "discuss[ed]" remedial work and potential insurance coverage with respect to the oil spill with "State representatives." Speonk never agreed

to undertake any remedial work at the service station site. Neither did Local Wrench, which went out of business and whose owner subsequently left the country. DEC hired contractors to investigate, clean up and remove the oil spill and paid them, in part, with moneys from the Environmental Protection and Oil Spill Compensation Fund established under article 12. DEC disbursed moneys for cleanup and removal intermittently from April 27, 1987 through September 30, 1996. On September 26, 1996, the State commenced this cost recovery action pursuant to the Oil Spill Act against Local Wrench and Speonk, seeking to recover cleanup and removal costs, plus interest.

In its initial decision in this litigation, the Appellate Division concluded that the successor owner of a system from which a discharge has occurred is liable when contamination remains after purchase (273 AD2d 681 [3d Dept 2000]). In a subsequent decision, the Appellate Division held that the State's claims under article 12 accrue and the six-year limitation period begins to run each time the Fund makes a payment; and that a discharger is not permitted to challenge the reasonableness of the Fund's expenditures (307 AD2d 59 [3d Dept 2003]). We granted Speonk and the State leave to appeal from the latter Appellate Division order, thereby also bringing up the earlier order for our review. We now affirm.

The Legislature enacted the Oil Spill Act to prevent the unregulated discharge of petroleum and to accomplish speedy, effective cleanups when spills occur (*see* Navigation Law § 171; *State of New York v Stewart's Ice Cream Co.*, 64 NY2d 83, 86 [1984]). Navigation Law § 181 (1) provides that "[a]ny person who has discharged petroleum shall be *strictly liable*, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained" (emphasis added). While section 181 (1) plainly sets forth the applicable standard of liability, "[a]ny person who has discharged petroleum," the category of persons strictly liable, is unspecified there or elsewhere in the Oil Spill Act. Navigation Law § 172 (8), however, defines the word "discharge" as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping" of petroleum into the state's waters.

In *State of New York v Green* (96 NY2d 403 [2001]), which was decided after the Appellate Division's decision on liability in this case, we read sections 181 (1) and 172 (8) together. Further, we construed these provisions liberally, consistent with the

purposes of the Oil Spill Act, so as to identify a basis for resolving responsibility as a discharger in light of the unique facts and circumstances of a particular spill. We predicated liability on a potentially responsible party's capacity to take action to prevent an oil spill or to clean up contamination resulting from a spill.

■ The State argues that Speonk had the "ability to control events at the spill site" within the meaning of *Green* because Speonk might have negotiated a purchase contract requiring Local Wrench either to remedy groundwater and soil contamination at the service station site, or to provide an escrow fund for this purpose as a condition of closing. While we decline to specify any particular action that Speonk might have undertaken, we consider it sufficient for purposes of liability here that, with knowledge of its vendor's discharge of oil and the need for cleanup, Speonk did nothing.

■ Next, in *Stewart's Ice Cream* we were faced, as we are here, with a situation where the Fund made multiple payments over an extended period of time although, unlike the circumstances in this case, all the payments were made within the six years prior to commencement of the litigation. We "reject[ed] the invitation to formulate a variant accrual date" under the Oil Spill Act in *Stewart's Ice Cream*, adhering instead to the "traditional view" that a new, separate cause of action accrues each time a payment is made (64 NY2d at 88). We reaffirm that holding here.

■ Finally, we note that section 181 (1) provides that a discharger shall be strictly liable for *"all* cleanup and removal costs . . . no matter by whom sustained" (emphasis added). Nowhere in the Oil Spill Act is a discharger afforded any right to contest the reasonableness of the costs incurred by the Fund in an action brought by the State to recoup these moneys. A discharger is not, however, divested by the Oil Spill Act of whatever rights it may have under article 78 of the CPLR to challenge the State's actions with respect to cleanup and removal as arbitrary and capricious or an abuse of discretion (*cf. United States v Hyundai Merchant Mar. Co., Ltd.*, 172 F3d 1187, 1191 [9th Cir 1999] [holding that federal Oil Pollution Act does not "restrict the recovery of the United States to costs that were prudent, or necessary, or reasonable" so long as government action was not arbitrary or capricious], *cert denied* 528 US 963 [1999]).

R.S. SMITH, J. (dissenting). I dissent from the Court's holding

that Speonk was a "person who has discharged petroleum" within the meaning of Navigation Law § 181 (1), because I do not believe those words can describe a person who, like Speonk, had nothing whatever to do with causing petroleum to be discharged.

In *State of New York v Green* (96 NY2d 403 [2001]), we held that a landowner who could have prevented the discharge of petroleum, but did not, was a "person who has discharged petroleum" within the meaning of the statute. This was a broad interpretation of the language, but not an unreasonable one, in the context of a statute that imposes liability without fault.

But it is quite another thing to apply the words "person who has discharged petroleum" to a company in the position of Speonk, which had no interest in or control over either the real property or the petroleum storage system at the time the discharge occurred. While failing to prevent a petroleum discharge may in a sense be the equivalent of discharging petroleum, failure to clean up the discharge afterwards is not. If the Legislature had intended to impose liability for failure to clean up, it would have said so.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and READ concur; Judge R.S. SMITH dissents in an opinion.

Order affirmed, without costs, in a memorandum.